FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

DEC 15 2004

Betty A. Griess, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| HARVEY H. MONTOYA, SR., Personal Representative of the ESTATE OF HARVEY L. MONTOYA, JR., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.  03-CV-164-J |
| HELMERICH & PAYNE INTERNATIONAL DRILLING COMPANY; SHELL EXPLORATION AND PRODUCTION; SHELL OIL COMPANY, ROYAL DUTCH/ SHELL GROUP, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER GRANTING DEFENDANT HELMERICH & PAYNE INTERNATIONAL DRILLING CO.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES**

The Motion for Partial Summary Judgment of Defendant Helmerich & Payne International Drilling Co., the plaintiff's response in opposition to the motion, and the defendant's further reply have come before the Court for consideration. The Court, having reviewed the parties' respective written submissions and materials filed in support of their positions, the pleadings of record, the applicable law, and being fully advised, FINDS that the motion should be GRANTED for the reasons stated below.

1

## BACKGROUND

This action arises out of an drilling rig accident that occurred August 6, 2002 in the Jonah field outside of Pinedale, Wyoming.  Harvey Montoya, Jr., ("Montoya"), the decedent, was working as a casing stabber for his employer, Central Valley Tongs ("CVT")[1] on a Helmerich & Payne International Drilling Company ("H&P") rig.   Montoya's employer,  CVT, and H&P were both subcontractors of Shell Exploration and Production Company ("SEPCO"), the owner/operator of this gas well.  H&P was hired by SEPCO to drill this gas well with H & P flex Rig #179.  SEPCO contracted separately with CVT to run the production casing down the well.  Montoya was working as a casing stabber for CVT on an H&P flex drilling rig.  While running the 22nd joint of casing, the traveling blocks and fill-up tool contacted and lifted Montoya's stabbing basket, pulling him against his safety harness attached to the rig, and caused a fatal

---

[1]CVT is a California-based casing company owned and operated by Russell Davis, Bonnie Davis, and Rusty Davis.  In an effort to capture some of the Wyoming oil and gas work, Russell Davis hired Evanston, Wyoming resident Randy Ridgeway in the spring of 2002.  Ridgeway then hired several casing workers from Uinta and Lincoln Counties, Wyoming, and together they formed the Wyoming branch office of CVT.  Prior to this August 6, 2002 casing job, the California CVT crew had very little experience working with the Wyoming crew.  Russell Davis fired Ridgeway in January 2003 for perceived financial improprieties; the Wyoming CVT crew left their employment with CVT.  Russell Davis thereafter changed the company name from CVT to Team Casing, Inc.

laceration of his lung.

The following discussion of the underlying facts is derived primarily from the defendant's motion and supporting memorandum.  Plaintiff has generally agreed with those facts, noting that the defendant's exposition is "somewhat selective" and plaintiff has offered some additional facts in his responsive brief in opposition.  See Plaintiff's brief at 4.

In its motion, H&P describes the driller as located in an enclosed "house" and operating the drilling rig with computerized controls.  The driller is able to see the stabber and stabbing basket by leaning forward, back or to the side. A  Gaitronics  (intercom)  system  allows  the  driller  and  floor  hands  to communicate.  At the time of the accident, the Gaitronics system was not working.  The parts necessary to replace the intercom had been ordered and the H&P electricians were waiting to receive them.  Randy Ridgeway, the CVT supervisor, knew the Gaitronics system was not working on the morning of the accident.  However, H&P asserts that it is well settled that in the oilfield, all communications  are  accomplished  with  "universal  hand  signals"  and  the Gaitronics intercom system is not a relied upon form of communication.

Prior to performing work on the rig, personnel from Shell, H&P and CVT attended a pre-tour and safety meeting.  During the pre-tour meeting, the main

people in the group were introduced to one another and the general plan for the day was discussed.  The second safety meeting was also attended by the H&P crew, the CVT crew and the Shell representative.  During the safety meeting, the crews discussed what should be done during casing operations.  The H&P rig manager, Terry Elliott, read the H&P standards and guidelines for casing operations to the CVT crew members, including Montoya.  It was made clear to CVT, and Montoya, that the CVT stabber needed to have 100% tie off while in the derrick.  Montoya said he had his own fall protection and his own harness.

The H&P casing operations standards provide:

> 49.24    The casing stabber will maintain 100% fall protection.  He should wear a full body harness connected directly into a self-retracting lifeline properly anchored to the derrick.  He should NOT be tied off to the stabbing board.

Defendant's Motion for Partial Summary Judgment, Tab 5.

At the morning safety meeting, tight, close clearances between the stabbing basket and the traveling blocks were discussed.  The tight clearances were noticed and discussed separately among the CVT supervisors and crew members while rigging up.  While some discussion occurred as to whether CVT could stab "off the girt" instead of using the stabbing basket, it was learned that

4

Shell required the use of a stabbing basket for running casing.  In an effort to gain two or three more inches of clearance between the stabbing board and traveling blocks, Montoya discussed taking off the "fold out" of the stabbing board with Jose Trujillo, but decided not to do so.

Because H&P rig manager Terry Elliott had concerns about how Ridgeway had pushed his crews on earlier casing jobs, Elliott emphasized that the Wyoming and California CVT crews "should all take our time" and they were "not gonna rush this casing job."  Elliott deposition at 197-198. He also discussed the importance of those casing hands informing the driller, Todd Goodon, whenever any hands in the derrick were to be relieved.  The CVT crews were informed that the H&P driller would "set the slips and stop [the traveling] blocks and let them rotate out and go on with the procedures." Elliott deposition at 214.  Additionally, in the safety meeting the crews discussed that the driller had a clear visibility of where everybody was standing on the rig floor and discussed the universal hand signals to be used to communicate.  Trujillo deposition at 105.

Elliott assisted Ridgeway and Montoya in rigging up the stabbing basket. No one instructed or controlled where CVT placed its stabbing board.  The stabbing basket used by CVT was built and designed by Harvey Montoya, Jr.

5

and he knew how he wanted to put it in the derrick.  Ridgeway deposition at 97.

During the rig up, all three men (Elliott, Ridgeway, and Montoya) discussed and

observed the clearances between the traveling block and stabbing basket inside

the derrick.  Elliott ran the blocks up and down three or four times so Montoya

and Ridgeway could see the amount of clearance.  Ridgeway deposition at 62.

CVT and H&P decided to turn the traveling blocks at a 45 degree angle to

provide about 6 to 12 inches or total clearance between the blocks and the

stabbing basket.  Elliott asked Ridgeway and Montoya whether they were

comfortable with the clearances and each indicated yes.

A SALA block was located approximately five or six feet directly above the

top of the stabbing board blocks.  Poling deposition at 45.  During the rig up,

Trujillo tested one of the SALA blocks and told Montoya that it was in good

working order.  Trujillo received no response from Montoya.  Trujillo deposition

at 61-62.  Rig 179 had a specific pad eye mounted SALA block for casing

stabbers to use during casing operations.   Elliott deposition at 136-137.

However, for reasons unknown to anyone but Montoya, Montoya did not use the

H&P self retracting lanyard (SALA block) directly above him.  No one from

SEPCO, H&P or CVT ordered Montoya to use the H&P SALA block; it was in plain

sight, ten feet above the stabbing basket.  The Wyoming CVT crew brought two

new CVT SALA blocks to this casing tub, but did not use either of them.

After the rig up but before running the casing, H&P tugger operator Kenneth Bisbee watched Elliott raise the traveling blocks in the derrick several times and "those blocks missed the stabbing [basket] by about 1 1/2-2 inches." Deposition Ex. 38-6, Tab 8. Bisbee stated:

> I told the stabber that the blocks were barely missing the stabbing board and he told me that it would not be a problem, they worked a lot of narrow derricks. Since he was responsible for rigging up the stabbing basket, I saw no sense in questioning his judgment. After all, he was the one who had to work on it.

After the close clearances were approved by Ridgeway and Montoya and the rigging up process was completed, CVT began its casing operation. H&P rig manager Elliott stayed on the rig floor through the first five joints of casing to make sure everyone felt comfortable with the casing process. Elliott deposition at 139. Once everyone determined that the casing was running normally, Elliott left the rig floor to make some phone calls. During the pause after the fifth joint of casing, Ridgeway spoke with Montoya and asked him what he thought about the close clearances. He is reported to have said "I know it's tight. We can try to push the blocks off, whatever," just like CVT stabbers always do. Ridgeway deposition at 84. After receiving the okay from Montoya, Ridgeway said, "Let's go up there and dodge some iron." Id.

The H&P driller, Todd Goodon, "a very knowledgeable driller," Potter deposition at 47, after the rig was up, began to run casing into the hole at approximately 122 feet per minute, a speed slower than normal.  Goodon was able to see Montoya from the driller's dog house without having to lean or adjust his body.  Goodon knew the clearances between the traveling blocks and stabbing basket were close and took precautions.  He could hear the casing crew on the rig floor.

During the casing operation, Ridgeway was in a hurry, according to Poling deposition testimony at 10.  At one point, Ridgeway told his CVT crew "from now on, if it ain't broke, we're not gonna stop, because I don't want to be here all night."  Poling deposition at 10.  While running the first 21 joints of casing, the crews had no problems other than minor adjustments.  Trujillo deposition at 109.  The H&P driller, Goodon, was "doing a good job ... not rushing or ramming and jamming..."  Trujillo deposition at 109, and was running the blocks "in a smooth manner...," and was ..."attentive and engaged..." and "following all signals I gave him."  Trujillo deposition at 110-111.  Trujillo felt he had good hand-eye signal communication with Goodon and the crews were pacing themselves to be as safe as possible.  There was no pressure from Shell or H&P to move quickly.  Trujillo deposition at 159.

8

H&P asserts in its motion that Montoya should have used the available SALA block above the stabbing board.   This was required by CVT and recognized as safer than tying off to a girt.  Trujillo deposition at 77.  However, Montoya chose not to use the CVT-required SALA block and was incorrectly tied off, with the ends of his lanyard looped around the derrick, and pelican hook tied to pelican hook.  Potter deposition at 64; Tab 11 photograph.

Prior to running the 22nd joint of casing, Ridgeway told CVT stabber Mike Nygard to relief Harvey on the stabbing board.  Ridgeway deposition at 96-97. Nygard told Jose Trujillo he was going up into the derrick to relieve Harvey and then climbed up the derrick climber on the driller side of the rig.  Trujillo deposition at 113; Ridgeway deposition at 99-100.  No one told the H&P driller Goodon that Nygard was relieving Montoya.   Ridgeway admitted in his deposition that Nygard should first have come to the driller's house and warned the driller he was going up in the derrick to relieve Montoya.   Ridgeway deposition at 103.

As the blocks and 22nd joint were raising, Harvey began yelling and Jose Trujillo looked up to see Harvey pushing the blocks away from him.  Trujillo deposition at 144.  During this time, Trujillo saw Goodon looking up at the traveling blocks as they are moving up and not looking at the rig floor.  Trujillo

9

at 116.  As the blocks were moving up, the corner of the fill up tool caught underneath the stabbing basket, lifting the basket with Montoya in it up the tracks.  Trujillo deposition at 142.  As the basket rose, Montoya's lanyard was pulled to full extension and he was pulled down and into the basket.  Elliott at 20.  The driller, Goodon, was focused on the traveling blocks when the stabbing basket and fill up tool first became caught on the blocks.  Goodon deposition at 41.  Goodon did not see the blocks and fill up tool snag the basket.  His first knowledge that something was wrong was when he heard the casing crew yelling.  Goodon deposition at 43.  He looked down to the floor and saw them waving their arms and saying "whoa."  Goodon released the joystick to stop the traveling blocks.  Goodon deposition at 47.

Within seconds, the traveling blocks separated from the stabbing basket, and the basket rolled down the tracks, breaking out of the bottom of those tracks and falling to the rig floor.  Elliott deposition at 18-19.  Montoya's lanyard did not absorb any force of his subsequent fall in, and then out, of the basket.  The static shock of hitting the end of the extended lanyard likely lacerated the upper quadrant of his left lung.  Dr. Sherman deposition at 41.  Jim Poling operated a winch and with the help of a relief stabber in the derrick, assisted Montoya to the ground.  Poling deposition at 20-21.  Elliott notified EMS in

10

Pinedale of the accident and Montoya was transported first to the Pinedale Clinic and then taken by air ambulance to Idaho Falls. He died en route to Idaho Falls, after going into cardiac arrest due to a lack of blood.

No one is certain what caused the traveling blocks to move into, catch and raise the stabbing basket. There was no wind at the time of the accident that might have pushed the blocks into the basket. Elliott deposition at 12. Several theories have been postulated as to cause, but H&P asserts that if Montoya had been properly using the available SALA block, he would have just dropped a foot or two and the fatal injury would likely not have occurred. H&P had never experienced an accident on this rig or other rigs where traveling blocks struck and lifted the stabbing basket and stabber.

The accident was investigated by Wyoming OSHA at the rig site. OSHA issued four serious violations to CVT, Montoya's employer, including lack of a working intercom system between the rig floor and driller's operating station; an employee in the stabbing basket being subjected to a fall in excess of six feet due to the manner in which his lanyard was attached to the derrick; lack of adequate fall protection training; and use of an oversized stabilizer during the casing operation causing a clearance problems with the equipment when one of the cars of the oversized bail stabilizer snagged the stabbing basket and

11

led to the death of an employee working in the basket.  Frank's Westates Services was issued two serious violations by OSHA, one for using an oversized bail stabilizer and fill up tool causing a recognized clearance problem and one for not adequately training its employees in the recognition, avoidance and prevention of unsafe conditions.  OSHA imposed a serious citation on H&P for having an inoperative intercom system and a non-serious citation for allowing the use of an oversized stabilizer by Frank's Westates while running casing.  No willful citations were issued to H&P by OSHA.

In the plaintiff's wrongful death complaint, plaintiff seeks to recover punitive damages.  Plaintiff argues that H&P's conduct during the drilling operation was willful and wanton and justifies an award of punitive damages. H&P seeks summary judgment in its favor on the punitive damages claim.

H&P argues that punitive damages are not a favorite of the law, noting that the purpose of punitive damages is not to provide a windfall to plaintiffs but to publicly condemn some notorious action or inaction on the part of the defendant.  H&P contends that ordinary negligence is never a basis for punitive damages nor is gross negligence.  Where the plaintiff cannot demonstrate that H&P acted with a state of mind approaching intent to do harm, punitive damages should not be considered by the jury.

H&P asserts plaintiff cannot prove the necessary elements of the claim for punitive damages, i.e., that H&P acted willfully or with a state of mind approaching an intent to do harm. Here, plaintiff must establish that the August 6, 2002 drilling rig accident was highly probable, providing evidence that H&P was aware of the degree of danger and that there was a high probability of harm. H&P concedes that reasonable jurors could conclude that H&P's conduct constitutes ordinary negligence, but no reasonable jurors could conclude that H&P's conduct, when taken as a whole, rises to the level of gross negligence. No one knew, appreciated or foresaw the danger and unlikely chain of events that ultimately led to the tragic death of Harvey Montoya, Jr. No one acted with a state of mind approaching an intent to do harm and as a matter of law, H&P's conduct does not constitute willful and wanton misconduct. Further, punitive damages require a high probability of harm.

H&P argues that none of the evidence demonstrates that any of the H&P employees, particularly Elliott and Goodon, individually or collectively, acted with a state of mind that approaches an intent to do harm. Reasonable jurors could conclude that Elliott, the H&P rig manager, and Goodon, the H&P driller, were individually or collectively negligent, but none could conclude they were grossly negligent or that their conduct rises to that egregious level of willful and

13

wanton misconduct.  It was not obvious to anyone, Ridgeway and Montoya of CVT, or Elliott or Goodon of H&P, that there was a high probability of an accident.   None of the men foresaw the possibility of the accident here. Because Elliott and Goodon were not aware of the degree of danger presented by the existing clearance and that danger was not obvious, there is no genuine issue of material fact and H&P is entitled to summary judgment in its favor.

Plaintiff opposes the motion for partial summary judgment.  Plaintiff notes that H&P had admitted that some of the following acts or omissions could be construed as negligence:

1. H&P designed and constructed the rig that housed the driller's controls in a location that limited the driller's visibility upward into the derrick.  King deposition at 66-67.

2. An attempt to compensate for the driller's limited visibility, an audio intercom system was installed. However, it was broken and H&P had not repaired it. Elliott deposition at 50-51; Ridgeway deposition at 85.

3. No spotter was stationed with the ability to observe the movement of men and equipment on the rig and relay signals to a visually and audio-limited driller.  Elliott deposition at 188.

4. H&P's own safety regulations required the use of a retractable safety line for a derrick man such as Montoya.  This type of safety line "catches" when vertical support for a man disappears, avoiding any

14

downward fall.  The rig had a SALA type line installed above Montoya's work station on his stabbing board in the derrick, but H&P failed to require the use of the device in violation of its own safety regulations. Davis deposition at 156-159.

5.   H&P was aware that there were extremely small clearances between the blocks, fill up tool, and other vertically traveling equipment and the stabbing board where Montoya stood high in the derrick.   Poling deposition at 46.

6.   H&P's driller operated the equipment that hit Montoya's stabbing board at a speed too high for the close clearances.

7.   H&P's rig manager suspected Montoya's supervisor, Ridgeway, might try to hurry the job.

8.   Montoya's employer, CVT, did not have the proper JSA (Job Safety Analysis) to work the job.  H&P knew this and that knowledge put H&P on notice that extra care should be exercised.  Ridgeway deposition at 30-31; Davis deposition at 201; Waleithner deposition at 113.

9.   H&P's driller operated the equipment without a clear view of Montoya, the vertically-traveling equipment, operated it too fast, operated it without appropriate audio communication and was distracted by other men working on the rig.

Plaintiff contends that any one of the above aspects of H&P's conduct could be considered negligent. Taken together, their cumulative effect amounts to the willful and wanton misconduct sufficient to justify a determination of

15

punitive damages, citing <u>Danculovich v. Brown</u>, 593 P.2d 187, 193 (1979). Plaintiff asserts that the necessary elements of proof for punitive damages are (a) that H&P knew that an accident and injury was highly probable, or that (b) it was obvious to H&P that a high probability of an accident existed.  Plaintiff also argues that H&P's multiple acts of negligence can be cumulated to permit a finding of willful and wanton misconduct.  Plaintiff asserts the question of willful and wanton conduct is a question of fact and should be submitted to the jury for determination in this case.

In its reply, H&P notes that plaintiff has generally agreed with the facts as outlined in H&P's brief.  It also notes that plaintiff concedes "H&P's assertion that H&P must 'act with a state of mind approaching an intent to do harm' to submit the willful and wanton misconduct question to the jury."  Reply at 2. Plaintiff apparently also concedes no single act or omission of H&P may be characterized as gross negligence, willful and serious misconduct or willful and wanton misconduct.  The entire thrust of plaintiff's response is that several acts and omissions may be aggregated or cumulated to transform ordinary negligence into willful and wanton misconduct.

H&P does agree that there are occasions in certain cases where the cumulation or aggregation of acts or omissions may permit a finding by a

16

reasonable juror of willful and wanton misconduct.  However, H&P disagrees with plaintiff that this is a case where the aggregated or cumulated ordinary negligence may rise to the level of willful and wanton misconduct.  There were no statutory violations in this case; there was no drinking, intoxication, or impairment of any involved personnel; the alleged negligence involves omissions; and unlike the driver in Danculovich, H&P actively took precautions to avoid any accident here.

At most, H&P asserts there are three acts or omissions of ordinary negligence, none of which, when aggregated with one another, rise to gross negligence or willful and wanton misconduct.  Plaintiff has criticized H&P for not enforcing Shell's written requirement that CVT provide Shell with a proper Job Safety Analysis (JSA) before commencing this casing operation.  H&P is not the party that could waive or enforce Shell's requirement that every contractor provide Shell with a written JSA before commencing operations.  To argue that H&P's failure to enforce Shell's requirement is an omission warranting punitive damages of H&P is not appropriate.  H&P provided its JSA for the job to Shell. It was accepted and approved by Shell.  CVT's employee, Rusty Davis, told Shell he had left CVT's JSA in the CVT pickup; Davis left the safety meeting to get it.  He did not return to the safety meeting and did not ever produce the

CVT JSA to Shell.  For whatever reason, Shell then allowed CVT to commence the casing operation even though CVT had not produced a JSA to Shell.  H&P and CVT were both contractors of Shell; H&P had no control or authority over CVT and whether it worked on the site.  Allowing CVT to run casing on the well is Shell's act or omission, not that of H&P which could be considered ordinary negligence or combined with another act or omission to H&P to constitute willful and wanton conduct meriting punitive damages.

Plaintiff has also criticized H&P because Goodon was distracted by other men working on the rig at or near the moment when he snagged the stabbing basket with the end of the fill up tool.  This cannot be deemed one of the H&P acts or omissions to be cumulated or aggregated.  No one told H&P driller Goodon that Nygard was going into the derrick to relieve Montoya.  Having a relief stabber climb into the derrick while running casing was an unusual event.  Normally, casing operations are stopped and the relief stabber is allowed to climb up and into the derrick to relieve the active stabber.  Potter deposition at 94.  Goodon testified he saw someone climbing in the derrick and it surprised him.  Goodon deposition at 44.  Ridgeway also testified Nygard should have first come to the driller's house to warn the driller he was going up in the derrick to relieve Montoya.  Ridgeway deposition at 103.  Goodon's diverted attention was

18

not due to intoxication, sleeplessness or other "misdeed," but by the negligence of the CVT employee Nygard, climbing into the derrick without notifying Goodon.

As to the non-functioning intercom, H&P admits it was not working and knew the intercom was down.  H&P told Shell and CVT the intercom was not functioning.  All three companies decided to commence the casing operation after discussing the importance of using good hand signals on the rig floor in the morning safety meeting.  Trujillo deposition at 105.  No one, including Montoya or any other CVT employee, expressed concern about the non-working intercom or the use of universal hand signals.  The use of hand signals is standard in the industry and intercoms are relatively new to gas well drilling. See Goodon and Elliott depositions.  H&P concedes that whether or not the non-working Gaitronics intercom system constitutes ordinary negligence is a question for the jury.  However, if it is negligence, this ordinary negligence does not rise to a level of willful and wanton conduct.

With respect to H&P's self-retracting lanyard regulation, H&P offers the following.  H&P has 27 separate casing operations regulations, which were read by Elliott, H&P's rig manager, to the CVT crew in the morning safety meeting. Poling deposition at 46.  H&P explains that it did so because H&P had not

previously worked with CVT, and CVT had not provided its own JSA to Shell for this job.  CVT's Jose Trujillo pointed to one of the H&P self-retracting lanyards on the derrick and told Montoya about it.  Montoya chose not to use it.  CVT brought two new SALA blocks to this rig site, but CVT did not provide either self-retracting lanyard to Montoya.  Another H&P self-retracting lanyard was located 5-6 feet above Montoya's head, but he did not use it.  Plaintiff has criticized H&P for "not telling" Montoya to use the H&P SALA block directly over his head.  H&P concedes that Terry Elliott (H&P), Marshall King (Shell), and Randy Ridgeway (CVT) did not point to that H&P SALA block and tell Montoya to use it.  Elliott did not think of doing so; neither did Ridgeway or Shell's representative, King.

H&P contends the responsibility for ensuring Montoya was properly rigged up to the provided SALA block falls upon everyone on the well site, including Montoya himself, other CVT employees, H&P's employees, and Shell.  No one with H&P appreciated that Montoya was not properly attached to the H&P SALA block.  This is an omission, not an act of negligence.  Unlike Danculovich upon which plaintiff relies, where the legal duty of care for each of the aggregated negligent acts was the defendant driver's, here the responsibility fell upon and was shared by everyone on Rig # 179.  The failures to notice and remedy the

20

safety violation fell on everyone, not just H&P.  This ordinary negligence does not, even if aggregated, rise to the level of willful and wanton conduct.

Plaintiff has also opined, through his liability expert, Ed Ziegler, that Goodon was lifting the casing too quickly for the close clearances as the lifted the joints of casing at 140 feet per minute.  He is the only person to so opine.  Trujillo, Montoya's coworker and fellow CVT employee, stated he was doing a good job, not rushing or ramming or jamming and was attentive and engaged, following all hand signals.  There is nothing on the elevation graph indicating anything but a smooth, slower than normal operation by Goodon.  Goodon did not appear to H&P and CVT employees to be operating the traveling blocks too quickly for existing conditions.  Goodon was never told to slow down or that he was running the blocks too fast for the close tolerances.  H&P concedes that reasonable jurors might find H&P driller Goodon ordinarily negligent for raising the traveling blocks too fast, given the close clearances, but none could conclude that his negligence, when cumulated with any ordinary negligence of rig manager Elliott, is so aggravated that it transforms into that which is different in kind from ordinary negligence, or willful and wanton misconduct.

H&P contends, even when aggregated or cumulated, its total conduct does not constitute gross negligence or an utter disregard or heedless violation

21

of the rights of others.  The accident was not probable and no reasonable juror

could ever conclude that H&P acted with a state of mind approaching an intent

to do harm to Montoya or anyone else.  H&P seeks partial summary judgment

on the plaintiff's claim forpunitive damages.


## LEGAL STANDARD

Summary judgment is proper when there is no genuine issue of material

fact to be resolved at trial.  Fed. R. Civ. P. 56(c); Nebraska v. Wyoming, 507

U.S. 584, 590 (1993).  Thus, a district court may grant summary judgment "if

the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue of

material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Nelson v. Geringer, 295 F.3d 1082, 1086 (10th

Cir. 2002).  "An issue of material fact is genuine where a reasonable jury could

return a verdict for the party opposing summary judgment."  Seymore v.

Shawver & Sons, Inc., 111 F.3d 794, 797 (10th Cir. 1997).

In applying these standards, the district court will view the evidence in

the light most favorable to the party opposing summary judgment.  Jenkins v.

Wood, 81 F.3d 988, 990 (10th Cir. 1996).  The movant bears the initial burden

22

of demonstrating the absence of evidence to support the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). When the non-moving party bears burden of proof at trial, the burden then shifts to it to demonstrate the existence of an essential element of its case. Id. To carry this burden, the non-moving party must go beyond the pleadings and designate specific facts to show there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986); Ford v. West, 222 F.3d 767, 774 (10th Cir. 2000). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to create a "genuine" issue of disputed fact. Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).

## DISCUSSION

The Wyoming Supreme Court has defined the narrow limits under which punitive damages may be awarded:

> Punitive damages are not a favorite of the law and are to be allowed with caution within narrow limits. Since the purpose of punitive damages is not to compensate a plaintiff, but to punish a defendant and deter others, such damages are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. The purpose of punitive damages is not to provide a windfall to plaintiffs and their attorneys, but to publicly condemn some notorious action or inaction on the part of the defendant.

> We have approved punitive damages in circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct.   Punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence.

Weaver v. Mitchell, 715 P.2d 1361, 1369-70 (Wyo. 1986).   In Wyoming, punitive damages are awarded only for willful and wanton misconduct.  Such conduct is defined as follows:

> Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.

Thunder Hawk By and Through Jensen v. Union Pacific R. Co., 844 P.2d 1045, 1051 (Wyo. 1992).  Additionally, punitive damages are disfavored.  Mayflower Restaurant Co. v. Griego, 741 P.2d 1106, 1115 (Wyo. 1987).  The Court has repeatedly made clear that wanton and willful conduct "must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention." Danculovich v. Brown, 593 P.2d 187, 191 (Wyo. 1979).   For this reason, punitive damages are inappropriate in circumstances involving inattention "or even gross negligence." Glover v. Transcor Am., Inc., 57 F. Supp. 2d 1240, 1250 (D. Wyo.

1999) (citing <u>Mayflower Restaurant Co.</u>, 741 P.2d at 1115).

Defendant asserts that there is no genuine issue of material fact because there is no evidence to support an award of punitive damages.  In the reported cases where juries are instructed on punitive damages, the facts are usually much more egregious than those presented here. *See* <u>Danculovich v. Brown</u>, 593 P.2d 187 (Wyo. 1979) (finding that the jury should have been instructed on punitive damage claim where driver was traveling approximately twenty miles per hour above the speed limit, had been drinking alcohol, and passed an automobile in a no-passing zone); <u>Meyer v. Culley</u>, 241 P.2d 87 (Wyo. 1952) (instructing jury on punitive damage claim where there was evidence that driver was traveling approximately thirty miles per hour above the speed limit and that driver had consumed alcohol).

The Wyoming Supreme Court has generally persisted in its analysis of claims for punitive damages over the years.  It notes that a claim for punitive damages "is a particular element of a cause of action, and it does not constitute a separate claim or cause of action." <u>Errington v. Zolessi</u>, 9 P.3d 966, 969 (Wyo. 2000).  In a case considering its jurisprudential rules relating to punitive damages following <u>BMW of North America v. Gore</u>, 517 U.S. 599, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Wyoming Court reiterated that the standard

for recovery of punitive damages:

> . . . requires more than intentional action, and encompasses "an intent to do an act, or an intent to not do an act, in reckless disregard of the consequences, and under such circumstances that a reasonable [person] would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another." Danculovich, 593 P.2d at 193. They are to be awarded only for "conduct involving some element of outrage, similar to that usually found in crime." Weaver v. Mitchell, 715 P.2d 1361, 1369 (Wyo. 1986).

Farmers Insurance Exchange v. Shirley, 958 P.2d 1040, 1051-1052 (Wyo.

1998).  It persists in these sentiments in Alexander v. Meduna, 47 P.2d 206

(Wyo. 2002).  There, the Wyoming Court stated:

> This court has recognized that punitive damages are an implement of public policy. . . .  Punitive damages are not intended to compensate the plaintiff; instead, punitive damages are awarded to punish the defendant and deter others from such conduct in the future.  .  .  .    Punitive  damages  cannot  be  awarded  when compensatory damages are not recoverable. . . . Punitive damages are not favored and are to be allowed cautiously within narrow limits. . . .  Such damages are to be awarded only for conduct involving some element of outrage similar to that usually found in a crime.  . . .
>
> We must determine whether the trial court reasonably concluded as it did because there is no right to punitive damages. .  .  .    Outrageous  conduct,  malice,  and  willful  and  wanton misconduct are sufficient bases to warrant punitive damages. . . . Sometimes, it is a fine distinction between conduct justifying punitive damages and less culpable conduct. . . .  However, the decision to award punitive damages is within the district court's discretion, and we will not reverse the decision on appeal without

finding a clear abuse of that discretion. . . .

In <u>Farmers Insurance Exchange v. Shirley</u>, 958 P.2d 1040 (Wyo. 1998), we adopted the punitive damages factors enunciated in <u>BMW of North America v. Gore</u>, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (the degree of reprehensibility, the disparity between the harm or potential harm suffered and the award of punitive damages, and the difference between punitive damages and the civil penalties authorized or imposed in comparable cases), and the seven factors adopted from the specially concurring opinion of Justice Houston in <u>Aetna Life Insurance Company v. Lavoie</u>, 505 So.2d 1050, 1062 (Ala.1987):

> "(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred.  If the actual or likely harm is slight, the damge should be relatively small.   If grievous, the damages should be much greater.

> "(2) The degree of reprehensibility of the defendant's conduct should be considered.  The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in detemrining this degree of reprehensibility.

> "(3)  If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

> "(4) The financial position of the defendant would be relevant.

> "(5)  All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
>
> "(6)  If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
>
> "(7)  If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award."

Shirley, 958 P.2d at 1044 (quoting Green Oil Company v. Hornsby, 539 So.2d 218, 223-24 (Ala. 1989)).

Alexander v. Meduna, 47 P.3d 206, 218-219 (Wyo. 2002) (some citations omitted).

Upon a review of the parties' submissions, the Court finds that plaintiff has presented no evidence warranting a find that punitive damages should be awarded in this case; the evidence offered does not suggest that the conduct of defendant H&P was willful or wanton.  This is not a case such as Danculovich where the cumulated negligence of the defendant was determined to support a finding of willfulness or wantonness.  What does appear here is a confluence of the ordinary negligence of numerous individuals and entities, including Harvey Montoya, Jr. himself, which resulted in the unfortunate and tragic accident of August 6, 2002.  In order to maintain the punitive damages claim

28

in this case, the plaintiff must establish that defendant H&P's conduct was outrageous, reckless, wanton, or willful and must demonstrate a state of mind approaching an intent to do harm. Such conduct must involve some element of outrage similar to that usually found in a crime. Plaintiff has failed to establish such evidence. The Court finds that defendant H&P is entitled to partial summary Judgment on the plaintiff's punitive damages claim as a matter for the reason that there is no genuine issue of material fact. Accordingly, it is therefore

**ORDERED** that defendant Helmerich & Payne International Drilling Company's Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages shall be, and is, **GRANTED.**

Dated this _15th_ day of _December_ 2004.

_____
UNITED STATES DISTRICT JUDGE